UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CHARLES COLARUSSO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 17-cv-11571-IT |
| v. | * | |
| | * | |
| FEDEX CORPORATE SERVICES, INC., | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER
September 30, 2020

TALWANI, D.J.

Plaintiff Charles Colarusso alleges that his former employer, FedEx Corporate Services, Inc. ("FedEx"), fired him in retaliation for Colarusso bringing a claim of discrimination against FedEx. FedEx now moves for summary judgment, contending that Colarusso is unable to support his claim of unlawful retaliation. For the reasons set forth below, the court concludes that Colarusso *has* put forth evidence from which a reasonable jury could conclude that FedEx's stated reason for firing Colarusso—that Colarusso falsified company documents—was a pretext and that the real reason was unlawful retaliation. Because the court concludes that there is a jury question on Colarusso's claim, FedEx's Motion for Summary Judgment [#100] is DENIED.

I.    Factual Background[1]

Plaintiff Charles Colarusso started working for FedEx in 1998. Pl.'s Ex. 1, Colarusso Aff'd ¶ 2, 24 [#113-1]. Colarusso was hired as a Customer Technical Consultant and his duties

---

[1] Defendant contends that Plaintiff's Statement of Facts ("Pl.'s SOF") [#113-1] does not comply with Local Rule 56.1. Def.'s Reply Mem. 1–9 [#115]. Defendant is correct: Plaintiff's pleadings on this motion are deficient as a matter of both style and substance. As for the former, Plaintiff combined all exhibits into a single file with the only differentiation between each of the exhibits being a single handwritten marking on the first page of each exhibit. Plaintiff then appended this

were to provide technical support to FedEx's customers who purchase software and equipment for business shipping. Id.

In 2011, Colarusso began developing symptoms of a vision-threatening eye condition called Birdshot Retinochoroidopathy. Dr. Foster Letter, Defendant's Evidentiary Appendix ("DEA") 45 [#103-3].

In July 2015, Colarusso submitted an accommodation request to FedEx. Colarusso Accommodation Request, DEA 44 [#103-3]. Colarusso stated that limitations in his vision impaired his ability to perform his job and requested three accommodations: the ability to tether the internet access from his mobile phone to his work computer, the ability to work remotely from a location other than his home office, and to be given a phone with a physical keyboard. Id.

---

compendium of documents to his statement of facts and attached this combined single file to his Opposition [#113]. Then, in his pleadings, Plaintiff referenced individual exhibits of this combined document without citation to the page of the compiled document. For consistency herein, the court references Plaintiff's exhibits by exhibit number, title, page or paragraph number in the exhibit, page number, and the docket index, but Plaintiff's counsel is directed to ensure that future filings comply with cm/ecf filing protocol.

Substantively, Plaintiff's statement of facts was also deficient. Plaintiff's statement of facts frequently included statements of opinion or conjecture. For example, "Postek's message to Beaver is disingenuous. The Defendant deliberately held the Plaintiff to a different stand[ard] than other CTCs." Pl.'s SOF ¶ 75 [#113-1]. In this way, Plaintiff's statement of facts often more closely resembled argument. Furthermore, Plaintiff sometimes cites to evidence not in the record and makes assertions without citations to the record. Finally, Plaintiff included no declaration explaining the exhibits attached and attesting to their accuracy.

Defendant and the court may have been well served by a prompt motion objecting to this filing. Instead, Defendant raised its objection in its Reply Memorandum, and proceeded to respond to Plaintiff's statement of facts in a manner that was also problematic. Instead of addressing the assertions of fact one-by-one, Defendant raised wholesale objections followed by specific objections to some of the individual factual assertions. See Def.'s Reply 3–6 [#115]. As a result, it is not apparent whether Defendant was disputing facts where a specific objection was not lodged.

Here, the court will consider material facts put forth by Plaintiff where there is no well-founded objection lodged by Defendant as to the specific fact and the asserted fact is supported by the record.

Colarusso submitted several notes from his physician as part of this request. See id. at 45, 47–48, 51–53. On October 22, 2015, FedEx granted Colarusso the accommodation of having the ability to tether to his mobile phone and a physical keyboard for his mobile phone. FedEx Letter, DEA 49 [#103-3]. However, FedEx denied Colarusso's request to work away from his home office or customer locations on the ground that the submitted medical information did not support such a request. Id. at 54.

In November 2015, Colarusso filed a charge of discrimination against FedEx with the Massachusetts Commission Against Discrimination ("MCAD"). Pl.'s MCAD Compl., DEA 55 [#103-3]. Colarusso's complaint alleged that in or about June 2015, Colarusso's supervisor, Stephen McDermod, prohibited Colarusso from continuing to work remotely from his mother's home on Cape Cod, where he had been working remotely for the previous 17 years. Id. at DEA 57. Colarusso complained that he had submitted a request for a disability accommodation that would allow him to, inter alia, work from Cape Cod instead of his home office and that FedEx had "unfairly" denied Colarusso's request for an accommodation. Id. at DEA 58. Colarusso raised several other concerns in his complaint, including an allegation that he had been subjected to unfair criticisms of his work in a June 2015 performance review. Id. at DEA 57.

Colarusso remained under McDermod's management while the MCAD complaint was pending. McDermod issued Colarusso "generally acceptable" performance evaluations for fiscal years 2015 and 2016 through FedEx's performance evaluation system, "APEX," Pl.'s Ex. 21, Def.'s Resp. to Pl.'s Interrog. No. 16, 102 [#113-1]; Pl.'s Ex. 2, McDermod Dep., 96:23–97:1, 34–35 [#103-3], but rated Colarusso's performance as "poor" for fiscal year 2017, Pl.'s Ex. 4, Colarusso Performance Review, 47 [#113-1]; Pl.'s Ex. 5, Higgins Email, 50 [#113-1].

3

On June 27, 2017, Colarusso met with McDermod and McDermod's supervisor, Ann Higgins, to discuss the 2017 performance review. During that meeting, Colarusso made remarks to Higgins that Higgins characterized as disrespectful and unprofessional. Id. at 51. Higgins subsequently wrote Colarusso a Letter of Warning for Unacceptable Conduct concerning the remarks. Pl.'s Ex. 6, Higgins Letter of Warning, 52 [#113-1].

On July 6, 2017, Colarusso internally appealed the Higgins warning letter. Pl.'s Ex. 7, Colarusso Appeal, 54 [#113-1]. In his appeal, Colarusso stated that he had felt "bullied and backed into a corner as the results of [his] attempt to secure a reasonable accommodation for my disability." Id. at 56. Higgins was notified of the appeal on July 7, 2017, and immediately discussed the appeal and the allegations contained therein with Cathy Beaver of FedEx Human Resources. Pl.'s Ex. 8, Higgins Email, 58 [#113-1].

On July 11, 2017, McDermod emailed Colarusso stating that McDermod wanted to "put in place a Performance Improvement Planner to ensure you are successful in your role as a Customer Integration Consultant." Pl.'s Ex. 9, Higgins Email, 61 [#113-1]. McDermod directed Colarusso to start creating the improvement plan and McDermod scheduled a time for Colarusso and McDermod to meet so that McDermod could work with Colarusso on the plan. Id. Colarusso wrote back that he wanted to delay scheduling the performance improvement plan until after having an opportunity to have a meeting with the Human Resources department and Colarusso's attorney. Pl.'s Ex. 12, Colarusso Email, 74 [#113-1]. McDermod wrote back, saying that while he encouraged Colarusso to keep his meeting with Human Resources, "it is important that we initiate the process to create an actionable plan for your performance success." Id. at 73

On July 18, 2017, then-counsel for Colarusso, Attorney Suzie Herold sent an email to McDermod and Beaver. Pl.'s Ex. 11, Herold Email, 64 [#113-1]. The email requested a litigation

4

hold on documents related to Colarusso and also noted that Colarusso would be participating in the performance improvement plan meeting scheduled with McDermod for later that week. Id. The email also noted that Attorney Herold had removed Colarusso's complaint from the MCAD process and had filed a lawsuit—which she attached to her email—in the Norfolk Superior Court. Id. Colarusso sent McDermod his performance improvement plan later that same day and then sent McDermod an updated plan on July 24, 2017. Pl.'s Ex. 12, Colarusso Email, 73 [#113-1]; Pl.'s Ex. 13, Colarusso Email, 76 [#113-1]. On August 4, 2017, Colarusso wrote McDermod to confirm that he had received Colarusso's plan. Pl.'s Ex. 13, Colarusso Email, 76 [#113-1]. McDermod responded on August 7, 2017, that he had not yet reviewed Colarusso's performance improvement plan due to being out of the office but would "review this week and get back to you with any questions." Id.

On August 23, 2017, Higgins, McDermod, and Ryan Postek—another manager with FedEx—communicated over email regarding a plan to shift Colarusso from McDermod's management to Postek's. Pl.'s Ex. 14, Postek Email, 79 [#113-1]. The email chain does not reveal the genesis of the plan or when the plan was conceived. Id. As part of the plan, Colarusso would keep his geographic territory in Massachusetts but would work as if he were part of Postek's geographic region. Pl.'s Ex. 15, Postek Email, 81 [#113-1]. In addition, Postek would take over Colarusso's performance improvement planner. Id.

In her deposition, Higgins stated that she came up with the idea of transferring Colarusso from McDermod to Postek on her own the day after having a separate conversation with FedEx's legal and human resources departments regarding Colarusso and McDermod. Pl.'s Ex. 17, Def. Higgins Dep. 19:11–22, 84 [#113-1]. Higgins testified that transferring Colarusso from McDermod to Postek was a management decision meant to address the strained relationship

between Colarusso and McDermod in order to provide Colarusso a "clean slate" so that he might be able to "start over." Id. at 19:11–17; id. at 20:21–22. Higgins also testified that she selected Postek because he was "firm," "fair," and "direct." Id. at 20:2. However, in Defendant's response to Plaintiff's interrogatories, Defendant stated that "Plaintiff was assigned a different manager to comply with federal and state law." Pl.'s Ex. 21, Def.'s Resp. to Pl.'s Interrog. No. 12, 99 [#113-1].

Higgins also testified that she first approached Colarusso with the idea of transferring him to Postek's management before approaching McDermod because she "wanted to get his permission first." Pl.'s Ex. 17, Def. Higgins Dep. 20:13–14, 85 [#113-1]. However, the August 23, 2017 email conversation between Higgins, Postek and McDermod—where the three discussed Higgin's plans—indicated that Higgins had not yet discussed the new management structure with Colarusso before coordinating its implementation with Postek and McDermod. See Pl.'s Ex. 14, Postek Email, 79 [#113-1].

Colarusso started reporting to Postek sometime towards the end of September 2017. See Pl.'s Ex. 16, Postek Email, 82 [#113-1]; Pl.'s Ex. 18, Postek Email, 89 [#113-1]. On October 18 or 19, 2017, Colarusso and Postek discussed Colarusso's new performance improvement plan. Postek Email, DEA 129 [#103-8]; Performance Improvement Plan, DEA 130–31 [#103-8]. The Performance Improvement Plan stated that it would begin November 14, 2017, would be "reviewed during "one-on-one meetings" with Colarusso, and "will end by and run by 1/31[/]2018." Performance Improvement Plan, DEA 130 [#103-8].

6

In one of these "one-on-one" meetings, held November 23, 2017, Postek raised a concern that Colarusso was using the generic term "research" in his "Nexus" time logs and emphasized the importance of entering "exact data" into Nexus.[2] Postek Email, DEA 137 [#103-8].

On February 5, 2018, Colarusso emailed Postek with his time log for the week ending 2/2/18, and asked if this was "the last time log now that the planner date has past?" Postek Email, DEA 139, [#103-8]. Postek responded that "will evaluate during our next 1 on 1." Id.

On February 14 or 15, 2018 (and in advance of a meeting Postek had scheduled with Colarusso for February 16, 2018), Postek had a conversation with Cathy Beaver from the FedEx Human Resources department in which Postek raised concerns to Beaver about Colarusso engaging in "falsification" of his Nexus entries and Beaver responded that she would "talk to legal" and get back to Postek. Pl.'s Ex. 23, Postek Email, 108 [#113-1]. Beaver then emailed Postek that the advice from the FedEx legal department was to "hold off on any communications with Charlie about this." Id. Based on these communications, on February 15, 2018, Postek cancelled a "one-on-one" that he had scheduled with Colarusso for the following day. See Pl.'s Ex. 22, Postek Email, 107 [#113-1]; Pl.'s Ex. 23, Postek Email, 108 [#113-1].

On February 16, 2018, Beaver informed Postek that he should "talk with Charlie and provide him with examples of where he falsified Nexus . . . but in an exploratory way giving him an opportunity to explain himself as to why the data appears to be falsified." Pl.'s Ex. 23, Postek Email, 108 [#113-1]. Beaver also instructed that Postek should "keep the Performance Planner open longer for the Nexus section." Id.

---

[2] McDermod explained in his deposition that the FedEx Nexus system was a "repository for keeping track of [FedEx] inventory of parts that are dispatched out into the field as well as a timekeeping repository as well as – an area where service activities are housed. Pl.'s Ex. 2, McDermod Dep. 21:2–6, 21 [#113-1]. Nexus is not used for billing purposes or for employee pay. Id. at 21:9–18.

7

Around the same time as these communications with Beaver, on the bottom of a piece of notepaper, Postek wrote the following hand-written notes:

> (in detail)
> describe performance plan in detail
> [describe] defendant policy to follow in electronic calendar
>
>     CTC expectations FY16
>
> defendant maintains calendar short commings
> describe policy to follow for work tickets
> defendant [illegible] maintain to work tickets perception
> please describe reason to work in cape cod, MA when not visiting customers
> satisfactory to unsatisfactory (last 3 [grades] from Apex)
> software tickets opened paragraph 43.

Pl.'s Ex. 20, Postek's Notes, 93 [#113-1] (marked with the date of February 14, 2018, and the word "Charlie" on top).

On February 23, 2018, Beaver signed Defendant's Responses to Plaintiff's Interrogatories. Pl.'s Ex. 21, Def.'s Resp. to Pl.'s Interrog., 94 [#113-1]. The questions asked and the responses provided included the following excerpts of text:

> [No. 7] describe, in detail, the reason(s) that the Plaintiff was issued a Performance Improvement Plan
> . . .
> [No. 8] describe, in detail, the Defendant's policy that Mr. Colarusso is required to follow with respect to electronic calendar maintenance. RESPONSE: FedEx's CTC Expectations . . .
> . . .
> [No. 9] explain in detail the Defendant's perception of the Plaintiff's shortcomings with respect to said calendar / calendar maintenance
> . . .
> [No. 10] describe, in detail, the Defendant's policy that Mr. Colarusso is required to follow with respect to work tickets
> . . .
> [No. 11] If Defendant contends that Mr. Colarusso inadequately maintains his work tickets or is deficient in any other way with respect to the work tickets, please explain in detail Defendant's perception of the Plaintiff's shortcomings with respect to said work tickets
> . . .

> [No. 14] describe, in detail, the reason(s) that the Company does not permit Mr. Colarusso to work from Cape Cod, Massachusetts during the days he is not visiting customers
> . . .
> [No. 16] If the Defendant contends that at some point Plaintiff's performance went from satisfactory to unsatisfactory, please identify the date and all reasons for Defendant's contention. RESPONSE: [explaining Plaintiff's Fiscal Year 2015, 2016, and 2017 APEX evaluations]
> . . .
> [No. 18] identify the number of software tickets opened for Plaintiff upon his return to work relative to his allegations as set forth in paragraph 43 of Plaintiff's [Complaint]

Pl.'s Ex. 21, Def.'s Resp. to Pl.'s Interrog. 94–106 [#113-1].

Postek ultimately did not discuss his "falsification" concerns with Colarusso. Pl.'s Ex. 1, Colarusso Aff'd ¶ 19 [#113-1]; Pl.'s SOF ¶ 65 [#113-1]. Instead, on March 16, 2018, Postek "close[d] out" Colarusso's performance planner, and sent an email to Colarusso confirming that the performance planner was being closed, and directing Colarusso that he "should continue to operate according to the FY18 Expectations . . . [and] continue to keep your outlook calendar up to date." Colarusso Email, DEA 143 [#103-8]. Postek noted further that "[i]t is critical that we, as FedEx team members, and members of management be 100% accurate in properly accounting for daily activities in all FedEx systems, paper documents, etc., and we are held to the highest standards of accountability." Id. At the end of the email, Postek asked Colarusso to confirm that he would comply with FedEx's policy. Id. On March 19, 2018, Colarusso replied that he would comply with the policy. Id.

On April 12, 2018, Postek emailed Higgins regarding Colarusso's Nexus entries. Pl.'s Ex. 24, Postek Email, 109 [#113-1]. Postek wrote that his "[M]arch audits on Nexus logging" revealed that the times Colarusso was entering into the Nexus system were "not accurate." Id. Postek shared with Higgins that the FedEx Nexus system would log when Colarusso was making his Nexus entries and that the time the entry was made would sometimes conflict with when

9

Colarusso was stating that he was doing something else. For example: "His Nexus entries on 3/23 indicate he did Email/Nexus from 0830-0930 ... He documented he was traveling to customer appointment from 1000-1100 which was during the time he entered Nexus from 1025-1035." Id.

On April 24, 2018, Postek wrote to Kathie Walthall of FedEx Human Resources. Postek Email, DEA 145 [#103-9]. Postek shared with Walthall "documentation on Charlie Colarusso showing that he has violated the Company Policy of Falsification of Company Records multiple times since he started working for me." Id. Postek attached to the email a 65-page document with screenshots from Colarusso's Nexus time log entries from October 2017 to March 2018 "showing multiple cases of discrepancies in the time that he logs vs. the system time stamps . . . ." Id. at DEA 146–211 [#103-9]. The email also attached a copy of the FedEx falsification policy and a termination letter. Id. at DEA 145.

On April 27, 2018, Postek submitted a request for termination to FedEx Human Resources. Pl.'s Ex. 25, Postek's Request for Termination, 126 [#113-1]; Pl.'s SOF ¶ 70 [#113-1]. The request for termination asked the submitter to "Identify and explain any formal complaints against FedEx within the last 2 years that you're aware of." Id. at 132. Postek stated in response that ". . . I am not aware of anything. He has mentioned to me during a 1-on-1 that he has retained a lawyer and he said there is a situation." Id.

On May 7, 2018, Walthall wrote back to Postek, stating that the legal review of the requested termination had been approved and that Postek could proceed with firing Colarusso. Pl.'s Ex. 26, Walthall Email, 133 [#113-1]. Colarusso was terminated on May 22, 2018. Pl.'s Ex. 28, Postek Letter of Termination, 135 [#113-1]. The stated reason for the termination was "violation of policy Falsification of Company Records." Id.

II.	Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012) (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009)). "A fact is 'material' if it has the potential of determining the outcome of the litigation." Id.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). In so doing, the court properly "give[s] no heed to speculative, unsupported, or unreasonable conclusions." Showtime Entm't, LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014).

III.	Analysis

Colarusso alleges that he was terminated in retaliation for engaging in protected activity in violation of Mass. Gen. Laws. ch. 151B, § 4. Section 4(4) of ch. 151B makes it unlawful for any person or employer to "discriminate against any person because he has opposed any practices forbidden under this chapter or . . . has filed a complaint, testified or assisted in any proceeding under [Mass. Gen. Laws ch. 151B, §5]."

The Massachusetts Supreme Judicial Court has recently restated the evidence that Plaintiffs must put forth to survive summary judgment for a ch. 151B retaliation claim:

> First, there must be evidence that the employee reasonably and in good faith believed that the employer was engaged in wrongful discrimination. Second, there must be evidence that the employee acted reasonably in response to that belief through reasonable acts meant to protest or oppose discrimination (protected

activity). Third, there must be evidence that the employer took adverse action against the employee. Finally, there must be evidence that the adverse action was a response to the employee's protected activity (forbidden motive).

Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 405–06 (2016) (internal quotations and citations omitted). Here, at least for the purposes of summary judgment, Defendant does not contest that Colarusso reasonably and in good faith believed that FedEx was engaged in wrongful discrimination, that Colarusso engaged in protected activity meant to protest or oppose that perceived discrimination, and that FedEx took an adverse action against Colarusso. Instead, FedEx's sole argument on summary judgment is that Colarusso's firing was unrelated to the protected activity that he engaged in and instead due to Colarusso's falsification of company records. Thus, the only question for the court on Defendant's summary judgment motion is whether Colarusso has put forth evidence from which a reasonable jury could find that Colarusso was fired as a response to his protected activity. For the reasons set forth below, the court answers this question in the affirmative.

As the Massachusetts Supreme Judicial Court noted in Verdrager, "employees claiming retaliation do not often possess direct evidence of the fourth element, a forbidden motive." Id. at 406. Therefore, employees may prove a forbidden motive through an analysis similar to the McDonnell Douglas burden-shifting framework. Id. (referencing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)). This three-part analytical framework is as follows:

> At the first stage [(the prima facie case)], the employee has the burden of producing evidence that she engaged in protected conduct, that she suffered some adverse action, and that a causal connection existed between the protected conduct and the adverse action. At the second stage, the employer must then articulate a legitimate, nondiscriminatory reason for the adverse employment decision. At the third stage, the employee must produce evidence that the employer's stated reason for its adverse action was a pretext for retaliating against her on account of her protected activity.

Id. A reasonable jury can infer from a combination of the prima facie case and a showing of pretext that "the employer's true motivation was retaliatory." Id. (citing Blare v. Husky Injection Molding Sys. Bos., Inc., 419 Mass. 437, 446 (1995)). Because the Massachusetts law has common features with federal law such as Title VII, existing federal case law is "helpful in the resolution of cases involving 151B." Hallgren v. Integrated Fin. Corp., 42 Mass. App. Ct. 686, 687 (1997). The court now addresses the three parts of this analytical framework in turn.

    1.    *Has Colarusso Produced Evidence of a Prima Facie Case of Retaliation?*

The court starts with the question of whether Colarusso has put forth a prima facie case; that is: (1) that he engaged in protected conduct, (2) suffered some adverse action, and (3) that a causal connection existed between the protected conduct and the adverse action. Here, Defendant does not dispute that the first two elements have been met and thus the only question is whether Colarusso has put forth evidence of a causal connection between the protected conduct and the adverse action. See Def.'s Mem. 8 [#101] (conceding no dispute as to the first two issues).

Defendant argues in its moving papers that Colarusso cannot establish a prima facie case of retaliation where Colarusso was fired two years after asking for an accommodation and nine months after filing his lawsuit in state court. Def.'s Mem. 9 [#101]. But Defendant's argument mischaracterizes how the jury may interpret the timing of events. From the facts in the record, a reasonable jury may, though need not, infer that Plaintiff's transfer to Postek in September 2017 was in response to Plaintiff filing his lawsuit in Massachusetts state court, perhaps as an effort to "manage him out." The record indicates that McDermod and Colarusso were in the middle of implementing a performance improvement plan—at McDermod's insistence—when, on July 18, 2017, Colarusso's attorney informed FedEx that Colarusso had filed a complaint against FedEx in Norfolk Superior Court. Pl.'s Ex. 9, Higgins Email, 60 [#113-1]; Pl.'s Ex. 12, Colarusso

Email, 73 [#113-1]; Pl.'s Ex. 11, Herold Email & Compl., 64 [#113-1]. After that date, McDermod appears to have made no additional efforts to work with Colarusso on the performance improvement plan that McDermod had previously insisted not be delayed. Instead, McDermod, Postek, and Higgins began discussing transferring Colarusso to Postek. See Pl.'s Ex. 13, Colarusso Email, 76 [#113-1]; Pl.'s Ex. 14, Postek Email, 79 [#113-1].

FedEx is quick to argue that because Colarusso's job responsibilities, geographic territory, and pay did not change when Postek became his manager, the transfer was not an adverse employment action. Def.'s Mem. 12 [#101] (citing Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)). While Defendant is correct that the transfer itself may not be actionable, that does not mean it is irrelevant for Plaintiff's prima facie case. As the Supreme Judicial Court noted in Mole v. Univ. of Massachusetts, evidence of retaliatory conduct that begins soon after protected activity may establish a prima facie case even where the actual adverse employment action occurs later. See 442 Mass. 582, 596 (2004). Plaintiff's position that he was fired out of retaliatory animus is further buttressed by evidence in the record from which the jury could infer that Postek embarked on a plan to terminate Colarusso immediately after a February 14 or 15, 2018 discussion in which Postek discussed the ongoing lawsuit with Cathy Beaver from the FedEx Human Resources department, who in turn was communicating on the issue with FedEx's legal department. See Pl.'s Ex. 20, Postek's Notes, 93 [#113-1]; Pl.'s Ex. 23,

Postek Email, 108 [#113-1].[3] Taken together, this evidence is sufficient to establish a causal nexus so as to create a prima facie case. See Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 49 (1st Cir. 2010) (holding, in the context of a Title VII retaliation claim, that a prima facie case of causation is met simply by showing temporal proximity between the two events).

    2.    *Has FedEx Put Forth a "Legitimate, Nondiscriminatory Reason" for Terminating Colarusso?*

If a Plaintiff can establish a prima facie case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for its employment action. See McDonnell Douglas, 411 U.S. at 802. "The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).

FedEx argues that Colarusso's termination was supported by his "falsification" of Nexus time records. Def.'s Mem. 12–13 [#101]. According to Defendant, Colarusso's conduct violated FedEx's internal policies and thus FedEx was "well within its rights to terminate" Colarusso when Postek discovered the irregularities in the Nexus entries. Id. at 13.

---

[3] Plaintiff contends that Postek's handwritten notes in Plaintiff's Exhibit 20 "are certainly from Postek's review of the Plaintiff's first set of interrogatories . . . ." Pl.'s SOF ¶ 62 [#113-1]. Defendant rebuts that this is an "illogical extrapolation[]" because the cited exhibit "is nothing more than handwritten notes, which contain various phrases on the bottom of the page." Def.'s Reply 7 [#115]. Defendant also contends that while the notes have the date "2/14/18" on the top of the page, it is not necessarily the case that all the notes are from the same date. Id. Here, all that needs to be said is that a reasonable jury could resolve the dispute of fact in favor of Colarusso based on the evidence in the record. See Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). Thus, Defendant will have the opportunity to present its argument that these notes contain nothing more than "various phrases" to a jury.

Defendants' bar at this stage of the inquiry is a low one. Defendants "need only produce enough competent evidence, taken as true, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action." Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st Cir.1997). Thus, although FedEx has not put forth any evidence that it has fired or formally disciplined other employees for the type of Nexus errors at issue in this case, the only question at this stage of the analysis is whether FedEx's explanation, *if believed by the jury*, would support a conclusion that Colarusso was not fired in response to protected activity. Hicks, 509 U.S. at 507. Because a reasonable jury could ultimately believe FedEx's stated reason, FedEx's burden of producing a legitimate, non-discriminatory reason for its employment action has been satisfied.

    *3.    Has Colarusso Produced Evidence of Pretext?*

Because FedEx has stated a non-discriminatory basis for firing Colarusso, the question now presented is whether Colarusso has put forth evidence from which a reasonable jury could conclude that "the reason proffered was 'a coverup' for a 'discriminatory decision.'" Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 6 (1st Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 805). At this stage of the inquiry, the analysis "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)); see also Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 118 (2000) ("At the third stage the employee must show that the basis of the employer's decision was unlawful discrimination").

Although the timing of events is considered in Colarusso's prima facie case, "it also may become the basis of the plaintiff's proof that retaliation was in fact determinative." Psy-Ed Corp.

v. Klein, 459 Mass. 697, 711 n.31 (2011). Here, as discussed above, Colarusso is able to identify two points in the record from which a reasonable jury could infer that FedEx treated Colarusso differently in close temporal proximity to protected conduct. First, within weeks of when Colarusso filed his discrimination action in Massachusetts state court, Defendant decided to transfer Colarusso to Postek's management.[4] Second, a jury may conclude that Postek first raised concerns about Colarusso's alleged falsification the same day, or the day after, Postek had a conversation with Cathy Beaver where Colarusso's lawsuit appears to have been discussed in some depth. The temporal proximity between these two sets of events, though arguably not enough to create a triable issue of fact on their own, certainly support Colarusso's case of retaliation.

Colarusso's strongest evidence of discriminatory animus arises from evidence in the record from which a reasonable jury may conclude that both Higgins and Postek were not entirely candid with their explanations for why they took certain employment actions with regard to Colarusso. Because the present inquiry is centered on the question of whether the employer acted with discriminatory intent, the analysis is ultimately a subjective one where the court must consider whether the employer "believe[d] in the accuracy of the reason given for the adverse employment action." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 35 (1st Cir. 2012) (citing Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008)). It is reasonable for a jury to doubt the accuracy of FedEx's stated reason for firing Colarusso based on the facts in the record here. First, Higgins represented in her deposition that she came up with the idea for transferring Colarusso to Postek on her own, that she did this partly for Colarusso's benefit so as

---

[4] As discussed above, while the shift in management may not have been an adverse action giving rise to ch. 151B liability itself, it may constitute evidence of a pattern of disparate treatment leading up to Plaintiff's termination.

to provide him with a "fresh start," and pursued it only after obtaining Colarusso's assent. Pl.'s Ex. 17, Higgins Dep. 20, 85 [#113-1]. However, emails between Higgins, McDermod, and Postek and FedEx's answers to Plaintiff's interrogatories do not corroborate this account. See Pl.'s Ex. 21, Def.'s Resp. to Pl.'s Interrog. No. 12, 99 [#113-1]; Pl.'s Ex. 14, Postek Email, 79 [#113-1]. Second, and more critically, Postek represented in his April 27, 2018 request to terminate Colarusso that he had no knowledge of any formal complaints by Colarusso against FedEx. Pl.'s Ex. 25, Postek Request for Termination Letter, 126 [#113-1]; Pl.'s SOF ¶ 70 [#113-1]. But this representation is belied by Postek's February 14, 2018 notes that evince a more intimate knowledge of Colarusso's lawsuit. Pl.'s Ex. 20, Postek's Notes, 93 [#113-1].

The circumstances surrounding Colarusso's termination may also provide a reasonable jury a basis for concluding that FedEx did not believe in the accuracy of the stated reason for firing Colarusso. First, it is notable that Colarusso was terminated after 20 years at FedEx without Postek first inquiring with Colarusso as to the perceived irregularities in the Nexus entries. Pl.'s Ex. 1, Colarusso Decl. ¶ 19, 27 [#113-1]; Pl.'s SOF ¶ 65 [#113-1]. This is especially curious where Human Resources directed Postek to provide Colarusso "with examples of where he falsified Nexus and . . . giv[e] him an opportunity to explain himself as to why the data appears to be falsified" and "to then keep the Performance Planner open longer for the Nexus section. Pl.'s Ex. 23, Postek Email, 108 [#113-1]. Instead, Postek closed out the performance planner, and sent an email to Colarusso telling him "to continue" what he was doing, Colarusso Email, DEA 143 [#103-8], only to use his Nexus entries during and after the time of the performance improvement plan as a basis for the termination. See Postek Email, DEA 144, 147–211 [#103-9]. Second, Colarusso has put forth some evidence from which a jury could conclude that he was treated differently than other FedEx employees with regard to his Nexus records.

Where employees engage in similar conduct but only one is subject to adverse treatment, an inference of discriminatory motive is bolstered. Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d. Cir. 1990). Here, Colarusso points to evidence that other employees' Nexus logs also suffered from various levels of inexactitude. Pl.'s SOF ¶¶ 76, 78 [#113-1]. While Defendant contends that the other employees' logs do not indicate that the other employees engaged in falsification but were instead "simply being sloppy in itemizing [time]," the line between sloppiness and falsification as applied to Colarusso's case is not as clean cut as Defendant makes it out to be. Furthermore, no other employees in Colarusso's organization within FedEx have ever been terminated for violating FedEx's falsification of Company records policy. Def.'s SOF ¶ 31 [#113-1].

While no single piece of evidence put forth by Colarusso may be enough to create a triable issue as to whether Colarusso was subject to unlawful retaliation, the sum of the record evidence constitutes "sufficient evidence of pretext and retaliatory animus to make out a jury question." Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012) (internal quotation omitted). Importantly, Colarusso has not "merely [] impugn[ed] the veracity of the employer's justification" but has instead "elucidate[d] specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (in the context of a retaliation claim under the Age Discrimination in Employment Act). Although the circumstantial evidence offered by Colarusso does not direct any particular verdict, it would allow a reasonable jury to infer that FedEx had an unlawful motive when firing Colarusso. Accordingly, summary judgment is inappropriate.

    *4.       Is Summary Judgment of No Punitive Damages Appropriate?*

Defendant moves for summary judgment on Plaintiff's claim for punitive damages. Def.'s Mem. 19 [#101]. Defendant argues that punitive damages are not appropriate because Defendant's conduct was not "outrageous or egregious" as required under Massachusetts law for an award of punitive damages. Haddad v. Wal-Mart Stores, Inc., 455 Mass. 91, 110 (2009) (holding that finding of intentional discrimination is not enough for an award of punitive damages, instead "the defendant's behavior [must be] particularly outrageous or egregious"). As with the merits of Plaintiff's claim, this is a close call. As discussed above, the evidence in the record on summary judgment is open to many interpretations, each of which casts a different level of animus and "evil motive" on FedEx. For that reason, a judicial finding of no punitive damages is premature at this stage. Defendant may renew the issue of punitive damages based on the trial record before the issue is submitted to the jury.

IV.        <u>Conclusion</u>

    FedEx's <u>Motion for Summary Judgment</u> [#100] is DENIED for the reasons set forth above. The clerk shall schedule a status conference for the week of October 12, 2020. The parties shall be prepared to discuss next steps, including scheduling this matter for trial, whether the parties consent to trial before a magistrate judge, and the parties' interest in referral for mediation.

    IT IS SO ORDERED.

Date: September 30, 2020                                                     /s/ Indira Talwani
                                                                                                  United States District Judge